IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MARYLAND
Northern Division

| | | |
|---|---|---|
| **William Snyder et al.** | * | |
| **Plaintiffs** | * | |
| v. | * | Case No.: L02-CV-00415 |
| **Chester County Mutual Insurance Co., et al.** | * | |
| **Defendants** | * | |

## MEMORANDUM IN SUPPORT OF MOTION TO ALTER OR AMEND JUDGMENT

COME NOW the Plaintiffs, WILLIAM E. SNYDER and MARY LOU SNYDER ("The Snyders"), by and through their counsel, Murray I. Resnick, Prabir Chakrabarty and Resnick & Abraham, LLC and hereby file this Memorandum in Support of their Motion To Alter or Amend Judgment pursuant to F.R.C.P Rule 59(e), and as reasons therefor, state as follows:

### INTRODUCTION

Plaintiffs presented numerous facts sufficient to prevent summary judgment being granted on their tort counts. The standard to be used by the Court in deciding the Motion for Summary Judgment was in a light most favorable to the Plaintiff. Genuine disputes of material fact have been revealed through testimony and documents produced in the course of discovery. Thus, this Honorable Court erroneously determined that the evidence provided wasn't sufficient to grant the Defendants Motion for Summary Judgment.

Plaintiffs' tort counts are proper, since the basis of Defendants' malicious conduct, through their Vice President of Claims for Chester and Cumberland, Frank Hoover ("Frank Hoover"), predated the contract dispute. An incident occurred in April of 2001 before the Snyders even asserted their claim, when Mr. Hoover told Mrs. Snyder that her policy was cancelled. When his superiors repudiated Mr. Hoover's determination of cancellation, he became angry with the Snyders.

Later after the Snyders presented their claim, Defendants' stated that they never suspected the Snyders of theft. Furthermore, their own adjuster and agent instructed the Snyders to submit a claim in excess of policy limits in order to waive their deductible. Yet, Defendants stated the reason they were requesting this financial information was the "excessive" amount of the claim. Thus, Defendants' conduct toward the Snyders clearly evidences malice and Maryland Courts do recognize various tort counts arising from breach of contract, including punitive damages.

## STATEMENT OF FACTS

On or about April 20, 1989, Mr. Snyder purchased an insurance policy ("the Policy") from Chester County Mutual Insurance Company. The Snyders properly made yearly premium payments to Chester County Mutual Insurance Company c/o Cumberland Insurance Company.

It is undisputed by Defendants that while Plaintiffs, William E. Snyder and Mary Lou Snyder ("the Snyders"), were on vacation from April 5, 2001 to April 10, 2001, their residence at 22 Virginia Avenue, Crystal Beach, Earlsville, MD ("the Home") was burglarized resulting in complete devastation of their home. See Defendant's

Memorandum in Support of their Motion for Summary Judgment ("Memorandum") at p. 2.

Due to the fact that Mr. and Mrs. Snyder were on vacation, the thieves had the time to scour every portion of their home including all of their drawers, cabinets, under the mattresses, in the lofts and every other space from the basement to the attic. As Scott Johnson of Hagan & Associates ("Scott Johnson"), insurance adjuster and agent for Cumberland and Chester County, noted, "the house was still in disarray." Please see Deposition of Scott Johnson at pp. 26-27, attached hereto and incorporated herein as **Exhibit A**. Defendants' own Vice President, Frank Hoover, admitted that house was "ransacked". Please see Deposition of Frank Hoover at p. 31, attached hereto and incorporated herein as **Exhibit B**.

The police told the Snyders to compile this "quick list" of items such as electronics or things that might sold at a pawnshop or in a flea market, which totaled approximately $15,000.00. See **Exhibit C**, Deposition of Mary Lou Snyder at p. 39-40; also see **Exhibit D**, Deposition of William Snyder at pp. 52-55. After completing their inventory the Snyders presented a complete list to the Cecil County Police Department. See **Exhibit D**, Deposition of William Snyder at pp. 52-56.

The Snyders complied with the various term of their insurance policy with Defendants including: prompt notification to Defendants through their agent, the filing of a police report and providing requested documents, including a preliminary inventory of their stolen property, showing the quantity, description, actual cash value and amount of loss. See Scott Johnson's Report of June 4, 2001 at p. 2, attached hereto and incorporated herein as **Exhibit E**. They attached bills, receipts and related documents that justify the

figures in the inventory.  See **Exhibit E**, June 4, 2001, Loss Report at p 2.  Pursuant to the Policy, the Snyders provided prompt written notice to Defendants through their adjuster Scott Johnson, including reasonably available information about the time, place and circumstances of the theft of their property from their home.  See **Exhibit E**, June 4, 2001 Loss Report at p.2-3.

Since the Snyders' claim involved theft, they notified the police of the theft, although the police had already conducted an investigation of their premises.  Furthermore, the Snyders submitted to examinations under oath.  Finally, the Snyders provided Defendants, within 60 days of the incident, with a sworn proof of loss, setting forth to the best of their knowledge and belief, the time and cause of the loss, detailed repair estimates, and inventory of stolen personal property and receipts for additional living expenses incurred.  See **Exhibit E**, June 4, 2001, Loss Report at p. 2.

Due the utter devastation of the Snyder's home by the thieves, the inventory of the stolen and damaged personal property included 77, 206.55 in contents loss and a special items claim of 18, 613.50 totaling $95,820.05, considerably less than their policy limits of $105, 279.00.  The Snyders were not going to include certain special items like jewelry and money in their claim but were urged by Defendant's adjuster, Scott Johnson of Hagan and Associates, to include every item stolen.  See **Exhibit A**, Deposition of Scott Johnson at p. 51-2.

Scott Johnson had explained that if the Snyders submitted a claim in excess of special policy limits or policy limits that Defendants would waive their deductible.  See **Exhibit A**, Deposition of Scott Johnson at p. 51-3.  Frank Hoover admitted that this accommodation is done in the ordinary course of business.  See **Exhibit B**, Deposition of

Frank Hoover at p. 47.  Despite this fact, the Snyders did not exceed their general policy limits of $105, 279.00, but did exceed their special policy limits of $1,200.00.

Mrs. Snyder had a brief conversation with Frank Hoover in May of 2001, regarding a letter from Defendants threatening to cancel her policy.  See **Exhibit C**, deposition of Mary Lou Snyder at pp. 58-61. Despite the fact that the Snyders had been loyal customers since 1989, Defendants stated that they would cancel the policy if they didn't receive their premium immediately.  See **Exhibit C**, Deposition of Mary Lou Snyder at p 58-9.  Ms. Snyder had spoken with a representative at Cumberland who had stated that if she mailed the payment that day it would be fine.  See **Exhibit C**, Deposition of Mary Lou Snyder at p. 58.  A few days later she got a letter canceling her policy.  See **Exhibit C**, deposition of Mary Lou Snyder at p. 59.

Mrs. Snyder called Defendants and was eventually forwarded to the vice President of Claims, Frank Hoover, who said that there was nothing he could do for her, when she asked to speak to the President; he said that no one could help her and she would not be reinstated.  See **Exhibit C**, Deposition of Mary Lou Snyder at pp. 59-60.  She eventually spoke to the President with whom she resolved the situation, and was later informed by a Vice President for Underwriting stating that the policy was still in effect.  See **Exhibit C**, Deposition of Mary Lou Snyder at pp. 60-61.

Mrs. Snyders' next significant contact with Frank Hoover was a telephone conversation at the end of August when she requested a status of her claim; Frank Hoover was very nasty, so much so that she felt like a "rape victim".  See **Exhibit C**, Deposition of Mary Lou Snyder at p. 63-4.  She was told that she would have to deal with his attorneys.  See **Exhibit C**, Deposition of Mary Lou Snyder at pp. 63-4.  Without any

adequate justification Frank Hoover then forwarded this claim to Cumberland's attorneys.

At his counsel's urging, Frank Hoover was then forced to set up a face to face meeting at the Snyder's home.  See **Exhibit C**, Deposition of Mary Lou Snyder at pp. 66-7.  When Mary Lou Snyder stated that she didn't want him at her house, Frank Hoover angrily called and berated her on the telephone.  See **Exhibit C**, Deposition of Mary Lou Snyder at pp. 70.  On September 6, 2001, Defendants' agent, Scott Johnson and its Vice President of Claims, Frank Hoover, traveled to Mr. and Mrs. Snyder's home.

At the actual meeting Frank Hoover felt, "there was tension in the air."  See **Exhibit B**, Deposition of Frank Hoover at p. 54.  He had a combative exchange with Mr. Snyder as he entered.  See **Exhibit B**, Deposition of Frank Hoover at p. 54-5.  Frank Hoover was belligerent and questioned the Snyders' motivations for filing their claim.  See **Exhibit C**, Deposition of Mary Lou Snyder at p. 77.  The Snyders were very open and forthcoming with their finances and indicated in the course of their conversation that two years earlier, Mr. Snyder had contemplated filing for personal bankruptcy; at not time did they mention that it was imminent.  See **Exhibit D,** Deposition of William Snyder at p. 68-70.  He also indicated that due to various factors, he never filed bankruptcy.  See **Exhibit D,** Deposition of William Snyder at p. 68-70.  He offered to show Frank Hoover the bankruptcy file but he refused to look at it.  See **Exhibit D,** Deposition of William Snyder at p. 69-70.  Further, the Snyders also offered to how other items to prove their damages, Frank Hoover stated that he would not look at them.  See **Exhibit D,** Deposition of William Snyder at p. 69-70.

The next correspondence between the Snyders and Cumberland was when Defendants' attorney sent a letter to the Snyders requesting financial records. Despite the fact that Plaintiffs provided thorough documentation of their claim, Defendants, through their attorneys, unreasonably requested a number of personal financial documents that did not bear any relation to the Snyders' theft loss claim, including: the Snyder's tax returns, which did not exist because they were not required to file them and a non-existent petition for bankruptcy. See **Exhibit D**, Deposition of William Snyder at pp. 12-3; also see **Exhibit C**, Deposition of Mary Lou Snyder at pp. 12-3.

To date, Defendants have only made payment to Mr. and Mrs. Snyder in the amount of $2,500.00 for the loss of their prescription medication as well as a payment for dry cleaning costs incurred by Mr. and Mrs. Snyder in the amount of $1,115.00. See **Exhibit E**, June 4, 2001 Loss Report at pp. 2, 4. Defendants have otherwise failed and refused to make any more payments to the Snyders, despite early assertions by their agents and employees that they would expeditiously make payments towards their claim. See **Exhibit D,** Deposition of William Snyder at p. 71-2. As stated, Defendants conditioned any further payment on the Snyders' production of detailed financial statements that are irrelevant to their stated claim and are intentionally delaying the payment of their obligations under said insurance policy.

On January 30, 2002, Defendant Cumberland Insurance Group sent a letter to Plaintiffs denying liability for their claim, even though he knew counsel represented them. See **Exhibit C**, Deposition of Frank Hoover at pp. 65-6. Defendants' failure to pay Mr. and Mrs. Snyder has caused them great hardship and suffering since they have been forced to live in an empty home and have been forced to repurchase their bare

necessities. The Snyders have had to undertake considerable personal expense for the replacement of items and goods. See **Exhibit C**, Deposition of Mary Lou Snyder at p. 85-6. The Snyders have also suffered immense emotional suffering, due to this ordeal, particularly due to Mr. Frank Hoover's conduct. See **Exhibit C**, Deposition of Mary Lou Snyder at p. 97-8.

## Standard of Law

A District Court retains the power to reconsider and modify its interlocutory judgments, including partial summary judgments at ant time prior to final judgment when such is warranted. American Canoe Ass., Inc. v. Murphy Farms, Inc., 326 F.3d 505, 514-15 (4th Cir. 2003).

Summary Judgment is only appropriate when the pleadings and evidence demonstrate that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Rule 56 (c) of the Federal Rules of Civil Procedure; Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Moreover, in ruling on a motion for summary judgment, the court must draw all inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. See Anderson v. Liberty Lobby Inc., 477 U.S. 242, 255 (1986). Thus, it is Defendants' burden to prove that there are no disputes of fact, with all inferences drawn in favor of Plaintiffs. Id.

> **I.    This Court Failed to Draw All Inferences in the Snyder's Favor And Accept Their Evidence As True That The Actions of Frank Hoover, Vice President of Claims for Cumberland, Demonstrated Actual Malice Sufficient To Support A Tort Action Arising From a Contractual Relationship and Moreover To Support Punitive Damage.**

"Actual or express malice" sufficient to justify an award for punitive damages may be characterized as the performance of an unlawful act, intentionally or wantonly, without legal justification or excuse but with an evil or rancorous motive influenced by hate; the purpose being to deliberately and willfully injure the Plaintiff. Drug Fair of Maryland, Inc. v. Smith, 263 Md. 341, 351-2 (Md. 1971). The actions of Frank Hoover were more than an effort to avoid payment they were committed with the explicit purpose to inflict harm on the Snyders. Plaintiffs presented a wealth of facts to support their tort claims. Although earlier Courts have declined to find tort counts arising from first party insurance contracts, the present matter evidenced a unique set of facts sufficient to prove Defendants acted with actual malice and are liable for tort remedies including punitive damages.

The Snyders presented facts sufficient to establish that Chester County and Cumberland's motives, specifically through the actions of their Vice President Frank Hoover, prove that the Defendants were motivated by a desire to harm the plaintiffs. Clearly Frank Hoover's conduct and actions were not justified and did not arise entirely from questions of "fraud" about the contract. Frank Hoover from the testimony presented to this court exhibited malicious conduct. More than merely attempting to question the size of the Snyder's claim, he was nasty, so much so that Ms. Snyder "felt like a rape victim". See **Exhibit C**, Deposition of Mary Lou Snyder at p. 63-4. His conduct could

9

not be construed to be the normal behavior of a Vice President of Claims dealing with insureds.

Frank Hoover already had a history with the Snyders, which preceded the breach of contract issues that are the substance of this complaint. The April 2001 incident regarding payment of the Snyder's premium did not arise from the contract. See **Exhibit C**, Deposition of Mary Lou Snyder at p. 60. Ms. Snyder had argued with Frank Hoover when he stated that he could not restore the Snyder's policy and "there was no one else" that could do the same. See **Exhibit C**, Deposition of Mary Lou Snyder at p. 60. Yet, the policy was reinstated. Clearly, Frank Hoover was offended by the fact that his authority had been challenged. At this point, the contract had in fact lapsed and the later rancor from Frank Hoover was not based on the contract itself.

When Frank Hoover called Mrs. Snyder, yelling, "[W]ho do you think you are?", his ire at the Snyders was not based upon their contract claim but was stemming from the fact that he had been embarrassed by Mrs. Snyder See **Exhibit C**, Deposition of Mary Lou Snyder at p. 70. By the time Frank Hoover actually came to the Plaintiffs home, he himself stated that there was "tension". There were heated exchanges between the parties, exacerbated by Frank Hoover's "very sarcastic" demeanor during the interview. See **Exhibit C**, Deposition of Mary Lou Snyder at p. 78. Moreover, as Plaintiffs stated in their deposition, Frank Hoover told them, in a threatening manner, "you can either give me the documents I requested or I can refer it to my attorney and it will be hundred times worse." See **Exhibit C**, Deposition of Mary Lou Snyder at p. 78.

Furthermore, Cumberland's own agent instructed the Snyders, to submit a claim in excess of their policy limits. See Deposition of Scott Johnson at p. 51-3. Yet, Frank

10

Hoover cited the size of their claim as a basis for his questioning. It is clear that Mr. Hoover never had any intention of paying the Snyder's claim and his conduct was evidence of his malice against the Snyders.

Finally, Mr. Hoover promised to pay the Snyders and failed to do so. He created an expectation that payments would be made. See **Exhibit D,** Deposition of William Snyder at p. 69-70. Hoover clearly showed ill will and malice towards the Snyders individually. As the Snyders testified, they attempted to show him proof of their losses and he declined to look at it. His conduct from their first encounter was not motivated to save his company money, but instead to do the Snyders harm.

As stated in Ms. Snyder's deposition testimony the malicious conduct began before the Snyders submitted their claim and continued through the course of the relationship. The lack of evidence of "financial difficulties" and the consequent exhaustive requests for financial records, prove not only a bad faith attempt to avoid payment of the suit, but evidence malicious conduct on the part of Frank Hoover. It is clear that Frank Hoover never had any intention of paying the Snyder's claim and his actions in preventing payment are clear evidence of malice.

WHEREFORE, Plaintiffs, William and Mary Lou Snyder, request that Defendants' Motion for Reconsideration be granted.

                RESNICK & ABRAHAM, L.L.C.

                BY: _____
                      Murray I. Resnick, Esquire
                      Prabir Chakrabarty, Esquire
                      One E. Franklin Street
                      Baltimore, MD 21202
                      (410) 539-6087

                      Attorneys for the Plaintiffs

**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MARYLAND
Northern Division**

| | |
|---|---|
| **William Snyder et al.** | * |
| **Plaintiffs** | * |
| v. | *   Case No.:  L02-CV-00415 |
| **Chester County Mutual Insurance Co., et al.** | * |
| **Defendants** | * |

### Certificate of Service

I HEREBY CERTIFY that a copy of the foregoing Motion for Reconsideration was mailed, postage prepaid, to George E. Reede, Jr., Esquire, and Lucinda E. Davis, Esquire, Niles, Barton & Wilmer, LLP, Suite 1400, 111 S. Calvert Street, Baltimore, MD 21202, Attorneys for Defendant.

RESNICK & ABRAHAM, L.L.C.

By: _____
Murray I. Resnick, Esquire
Prabir Chakrabarty, Esquire
One E. Franklin Street
Baltimore, MD 21202
(410) 539-6087

Attorneys for the Plaintiffs

13

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MARYLAND
Northern Division

| | |  | |
|---|---|---|---|
| **William Snyder et al.** | * | | |
| **Plaintiffs** | * | | |
| v. | * | Case No.:  L02-CV-00415 | |
| **Chester County Mutual Insurance Co., et al.** | * | | |
| **Defendants** | * | | |

## ORDER

UPON CONSIDERATION of Plaintiff's Motion for Reconsideration, and any opposition thereto, it is this _____ day of _____, 2002, by the United States District Court for the District of Maryland,

ORDERED, that Plaintiff's Motion For Reconsideration is hereby GRANTED.

_____
The Honorable William D. Quarles, Jr.
United States District Court
for the District of Maryland

cc: Murray I. Resnick, Esquire
Prabir Chakrabarty, Esquire
One E. Franklin Street
Baltimore, MD 21202

George E. Reede, Jr., Esquire
Lucinda E. Davis, Esquire
Niles, Barton & Wilmer, LLP
Suite 1400, 111 S. Calvert Street
Baltimore, MD 21202