DEPOSITION OF: FRANK HOOVER
TAKEN ON JULY 22, 2002

Page 30

1  replaced it for.
2      Q.  Okay.  And is this something that's
3  specifically in the insurance contract that they sign
4  or is that --
5      A.  It's in the policy language.
6      Q.  Okay.  You said you don't remember
7  exactly when this notice originally came across your
8  desk, what is your first memory as to this particular
9  theft claim by the Snyders?
10     A.  What's my first recollection?
11     Q.  Yes, in dealing with this theft claim.
12     A.  Probably receiving a phone call from
13  Scott Johnson after he had met with Mrs. Snyder.
14     Q.  And do you know approximately when that
15  was?
16     A.  No, I don't.
17     Q.  Did you receive any documents from Scott
18  Johnson or just a phone call?
19     A.  Initially, the adjuster usually calls and
20  then it's followed up with a report.
21     Q.  And what was the substance of that

Page 31

1  conversation?
2      A.  I believe he just told me that he had
3  been to the house, met with Mrs. Snyder, that the
4  house had been ransacked, and that the Cecil County
5  Sheriff's Department had investigated it.
6      Q.  Did you give them any instructions?
7      A.  At that point, no.
8      Q.  Well, how did you guys leave the
9  conversation?
10     A.  I don't remember.
11     Q.  Do you know when he initially had a
12  chance to -- I'm sorry.  So this was after he had
13  actually gone to the house and taken the pictures and
14  done an inventory or was this previous to his actual
15  travel to the Snyders' home?
16     A.  After his actual travel.  And Mr. Johnson
17  never did an inventory.
18     Q.  When was the next time you spoke to
19  Mr. Johnson?
20     A.  I don't recall.
21     Q.  Okay.  Was there a -- do you remember any

Page 32

1  correspondence from Mr. Johnson?
2      A.  I'm sure I received a report at some
3  point in time.
4      Q.  Okay.  Do you remember anything unusual
5  about the report?
6      A.  No.
7      Q.  Did Mr. Johnson -- did you again after
8  receiving the report have another discussion with
9  Mr. Johnson?
10     A.  After receiving the report?
11     Q.  Uh-huh.
12     A.  I don't recall that I did.
13     Q.  Okay.
14     A.  I mean, I may have, but I just don't
15  know.  My recollection is just not that specific.  I
16  mean, I talk to so many people on a daily basis that
17  I can't possibly remember every single phone call.  I
18  can't remember that.
19     Q.  Okay.  Well, when was the next time that
20  you spoke to Mr. Johnson?
21     A.  I think you just asked me that.

Page 33

1      Q.  No, I'm saying -- okay.
2      A.  I don't have a specific recollection when
3  I spoke with Scott next after receiving the phone
4  call about his initially meeting with Mrs. Snyder.
5      Q.  Okay.  So do you remember any discussions
6  after that with Mr. Johnson?
7      A.  I mean, I remember there were telephone
8  calls, but the exact nature of those telephone calls,
9  no, I don't remember.
10     Q.  Do you guys at Cumberland, I guess
11  Chester County first and now Cumberland, have a
12  policy with respect to telephone calls?
13     A.  With respect to -- I don't understand.
14     Q.  Making a written notation or --
15     A.  Normally in the course of business if a
16  phone call is made, yes, we would note that.
17     Q.  Do you know whether that was done in this
18  case?
19     A.  No, I don't.
20     Q.  Okay.  Were it done, would it be in your
21  claim file?

DEPOSITION OF: FRANK HOOVER
TAKEN ON JULY 22, 2002

Page 46

1  Scott Johnson, insured submitted inventory with
2  amount of 103 thousand theft loss in parenthesis. Do
3  you remember a conversation with Mr. Johnson
4  regarding this?
5      A.  Specifically, no.
6      Q.  Okay. Was that an unusual number, 103
7  thousand dollars?
8      A.  Yes, I thought so.
9      Q.  Why was that?
10     A.  The initial police report indicated a 15
11  thousand dollar loss and also the 103 thousand
12  dollars was extremely close to the policy limit of
13  liability in the contents coverage.
14     Q.  Now, where did you come up with the
15  amount of 103 thousand dollars?
16     A.  That was provided by Mrs. Snyder. If you
17  add up all of her 40 some sheets from the figures
18  that she presented, that's what they total.
19     Q.  Did you do that independently or was that
20  something that Mr. Johnson did?
21     A.  Scott would have run a tape on that.

Page 47

1      Q.  Did you -- so you didn't actually total
2  those figures up yourself?
3      A.  I don't believe so, no.
4      Q.  Did you have any discussion with Scott
5  regarding his discussion with Mrs. Snyder or I guess
6  any other claimant in terms of waiving deductibles?
7      A.  Did I specifically, no.
8      Q.  Have you ever had a discussion with him
9  regarding that?
10     A.  Not that I can recall. But it's
11  something that's done in the normal course of
12  business.
13     Q.  Something that's done. How do you
14  usually -- in which cases do insurance companies
15  waive deductibles?
16     A.  In those situations where they've
17  exceeded a limit of liability on a specific item like
18  jewelry or cash or furs or they've exceeded the
19  available coverage under the policy. It's more or
20  less an accommodation by the insurance company to the
21  insured.

Page 48

1      Q.  That didn't happen, even at the 103
2  thousand that's listed there, that did not happen in
3  this case, correct?
4      A.  Well, there was limits of liability for
5  jewelry and money.
6      Q.  Correct. So it did exceed the special
7  limit, but not the policy limit?
8      A.  No.
9      Q.  Okay. Have you ever had an inventory
10  presented of this size before?
11     A.  Not on a homeowner's theft loss, no.
12     Q.  And what's the highest would you say
13  you've seen previously?
14     A.  Thirties or forties.
15     Q.  Did that strike you as an unusual amount,
16  the sheer amount of the inventory?
17     A.  Yes.
18     Q.  Did you have a chance to review all of
19  the other documents that Mr. Johnson had gathered
20  like the pictures of the home, things of that nature?
21     A.  Review them when?

Page 49

1      Q.  Well, I guess --
2      A.  When they were submitted?
3      Q.  Yes.
4      A.  When they came in the form of a report
5  from him?
6      Q.  Correct.
7      A.  Yes, I would have looked at them, sure.
8      Q.  Okay. What was your next step after this
9  conversation in September, September 9, 2000?
10          MS. DAVIS: I believe it's August 9th.
11     Q.  I keep saying that, sorry. August 9,
12  2001.
13     A.  I don't know what my next step was. If I
14  had the file notes, I could tell you what the next
15  step was.
16          MR. CHAKRABARTY: Seeing as they've been
17  redacted from this document, are you going to
18  instruct him not to answer?
19          MS. DAVIS: You can ask him questions.
20  We are not producing the document, they were prepared
21  in anticipation of litigation, but you can ask him.

DEPOSITION OF: FRANK HOOVER
TAKEN ON JULY 22, 2002

Page 54

1 that are on the inventory and where they were when
2 they were taken, what documentation they had for
3 them.
4    Q.   How would you describe their reaction to
5 those questions?
6    A.   When I first entered the house,
7 Mr. Snyder was a little bit combative with me.
8    Q.   How so?
9    A.   Well, he wanted to know what the hell was
10 going on, why this process was taking so long. There
11 were times in our meeting which lasted maybe an hour
12 and a half that things got a little bit, what's the
13 right word, a little tension in the air, certainly no
14 yelling or screaming, but then they got back to an
15 amiable status.
16    Q.   Okay. And at what point was that, that
17 they got back to an amiable status?
18    A.   At various times during our meeting and
19 at the time that we left the house.
20    Q.   So do you specifically remember any of
21 the subjects of the conversation?

Page 55

1    A.   Not specifically, no.
2    Q.   How about the subject of bankruptcy, do
3 you remember specifically what was discussed?
4    A.   Only that it was brought up by
5 Mr. Snyder.
6    Q.   Okay. But you don't remember what he
7 brought up?
8    A.   No, I don't.
9    Q.   Okay. And you don't remember whether the
10 indication was that they had contemplated bankruptcy
11 or they were imminently contemplating bankruptcy,
12 meaning at that very time?
13    A.   I don't know.
14    Q.   Did you have a discussion regarding your
15 mental notes regarding the rehabilitation? I guess I
16 should say not the mental note, but the
17 rehabilitation.
18    A.   I don't think we did. I don't think so.
19    Q.   Did you make specific inquires as to the
20 condition of rooms such as you mentioned one of the
21 two bathrooms wasn't working?

Page 56

1    A.   It wasn't finished.
2    Q.   Okay. I'm sorry, it wasn't finished. Do
3 you remember anything that you discussed regarding
4 the bathroom condition?
5    A.   I didn't ask them why the molding wasn't
6 finished or why the light covers weren't there.
7    Q.   Do you remember the Snyders offering to
8 show you a copy of their bankruptcy file?
9    A.   No, I do not. The only thing I do have a
10 vivid recollection of is there was something about
11 money orders and Mrs. Snyder said something about she
12 could show me something in regards to money orders
13 and I told her it wasn't necessary.
14    Q.   Why wasn't it necessary?
15    A.   I didn't think it was important at that
16 time. Plus, the money orders were subject to a
17 policy limit of liability of 200 dollars anyway, so
18 it was really an insignificant part of the claim.
19    Q.   Okay. Well, did you have any reason to
20 believe that at that point in actually seeing the
21 home and Mr. Johnson's report that the home had been

Page 57

1 burglarized?
2    A.   I don't think I ever questioned whether
3 there had been a burglary there.
4    Q.   Did you actually ever speak to someone in
5 the police office?
6    A.   I met with Detective Holmes.
7    Q.   When did that occur?
8    A.   Right after my meeting with the Snyders.
9    Q.   Before we get to that, was there anything
10 else that you can recollect about your meeting with
11 the Snyders, I guess do you remember how you left the
12 conversation?
13    A.   Mrs. Snyder asked me about a dry cleaning
14 bill and I told her that if she submitted the bill to
15 me, I would make sure it got paid. It did get
16 submitted and I paid it the same day it was submitted
17 to me.
18    Q.   How about a Gateway computer?
19    A.   No.
20    Q.   You don't remember anything regarding
21 a -- saying that you would pay the Gateway computer

DEPOSITION OF: FRANK HOOVER
TAKEN ON JULY 22, 2002

Page 62

1    A.  The initial submission by the police
2    report of a 15 thousand dollar loss, it took three
3    months to get the inventory from Mrs. Snyder and then
4    it's very very close to the amount of the policy
5    limits, the types of things that were taken anywhere
6    from spices to shampoo to underwear, the fact that
7    Mr. Snyder had mentioned bankruptcy, the fact that
8    Mrs. Snyder mentioned gambling on many occasions, all
9    those things, just kind of trying to tie up loose
10   ends really to establish whether there was a
11   financial motive one way or another in presenting
12   this claim.
13       Q.  One way or another in what way?
14       A.  Whether there was a financial motive in
15   submitting the claim in its entirety, the amount of
16   the claim.
17       Q.  But you said one way or another.
18       A.  Establish whether there was a financial
19   motive or there wasn't a financial motive.
20       Q.  And that financial motive would have been
21   some sort of complicity with this theft act?

Page 63

1    A.  No, not with the theft act, no.
2        Q.  So did you ever yourself discuss with
3    Detective Holmes the perpetrators of the theft or the
4    circumstances of it?
5        A.  I don't know if I did, but the Snyders
6    mentioned there was a ring in Baltimore that was
7    operating and they had some concerns that a neighbor
8    might have been a party of that.  I don't know if I
9    brought that up in our discussion with Detective
10   Holmes or not.
11       Q.  And do you remember whether he confirmed
12   that?
13       A.  I said, I don't remember whether we
14   discussed that or not.
15       Q.  So the financial motive would have been
16   the amount of the claim?
17       A.  Yes.
18       Q.  Okay.  So that was what you were trying
19   to determine?
20       A.  Yes.
21       Q.  Now, it took three months to submit the

Page 64

1    claim.  Did Mr. Johnson ever indicate to you in any
2    discussions he had with the Snyders regarding their
3    delay in providing the inventory?
4        A.  No.
5        Q.  So did you ever have any discussion with
6    the Snyders regarding it?
7        A.  No.
8        Q.  So it was the mention of bankruptcy that
9    concerned you?
10       A.  An admission?
11       Q.  No, you said the mention of bankruptcy.
12       A.  Oh, it was one of many things.
13       Q.  So what happened at that point after
14   meeting with the detectives and --
15           MS. DAVIS:  I mean, if you recall what
16   happened.
17       A.  Just that I thought it was appropriate
18   for George to ask the Snyders for certain
19   documentation and the purpose of that was to
20   determine whether an examination under oath was
21   needed.

Page 65

1        Q.  Did you specifically provide a list of
2    documents that you required?
3        A.  No.
4        Q.  So you basically gave it to the attorneys
5    to handle from that point on?
6        A.  Yes.
7        Q.  What was the next dealing you had with
8    this matter?  I guess apart from any of your
9    discussions with your attorney specifically.
10       A.  Outside of dealing with Mr. Reede?
11       Q.  Correct.
12       A.  None, just the denial of the claim.
13       Q.  Okay.  When did that occur?
14       A.  After the Snyders not only didn't produce
15   the requested documentation, but refused to do so.
16       Q.  And was it your understanding that --
17   well, what was your understanding of the refusal to
18   provide documentation?
19       A.  That they simply refused to provide
20   anything that was requested by Mr. Reede.  They
21   didn't say, we can't provide them, they said that

DEPOSITION OF: FRANK HOOVER
TAKEN ON JULY 22, 2002

Page 66

1  they refused to provide them.
2      Q.  Okay.  Once you had referred this to your
3  attorney, was there a reason that you wrote this
4  letter directly to the Snyders denying the claim?
5      A.  Yes, because it should come from the
6  company.
7      Q.  That's the policy of --
8      A.  Yes.
9      Q.  I'm sorry.  Of Chester County and
10  Cumberland?
11      A.  Yes.
12      Q.  Okay.  And at that point you were aware
13  that the Snyders had counsel, correct?
14      A.  I believe so.
15      Q.  Was there a reason that you didn't send
16  it to counsel for the Snyders?
17      A.  I thought it was sent to counsel.
18          MR. CHAKRABARTY:  I probably just have a
19  few more questions.  Let's take a quick break.
20          (Whereupon, a brief recess was taken.)
21          EXAMINATION BY MR. CHAKRABARTY:

Page 67

1      Q.  You said in your conversations with the
2  Snyders at their home that you understood that
3  Mrs. Snyder gambled a lot, did she specifically say
4  that she gambled a lot or how did you come to that?
5      A.  Just in the course of our conversations,
6  she mentioned gambling quite a bit and being down in
7  Atlantic City quite a bit.
8      Q.  Did you ever ask either her or Mr. Snyder
9  whether they liked to gamble or --
10      A.  Specifically that question, no.
11      Q.  Did you ever ask Mr. -- okay.  Never
12  mind.  Did Scott Johnson ever inform you of
13  Mrs. Snyder's health problems during the summer of
14  2001?
15      A.  I knew she had a back problem.
16      Q.  And did you know about her back problem?
17      A.  That she had a back problem.
18      Q.  Did she ever mention anything about a
19  spinal fusion or anything of that nature?
20      A.  I don't recall.
21      Q.  Did you ever consider that that might be

Page 68

1  a factor in the delay in submitting the inventory?
2      A.  No.
3      Q.  When did you make the decision to refer
4  this file to an attorney and what was the basis of
5  that decision?
6      A.  That our requests for documentation, for
7  additional documentation on the inventory be
8  submitted, was getting nowhere.  That Mrs. Snyder
9  told me that there was no other documentation, she
10  couldn't provide any more.  I'm talking about
11  documentation as far as items on the inventory that
12  were mentioned as being stolen.  A lot of responses
13  were, you know, these are credit card purchases and I
14  don't have the credit card statements anymore.  Well,
15  anybody can get any of their financial records from
16  any of their financial institutions that they deal
17  with, so that wasn't an adequate answer.
18      Q.  As far as you know, though, and other
19  than that one letter from Mr. Johnson, was there ever
20  any other requests made of the Snyders to provide
21  additional receipts?

Page 69

1      A.  I believe Scott had talked to Mrs. Snyder
2  on several occasions asking for additional receipts.
3      Q.  But by the time you went to the home and
4  discussed these matters with them, you had already
5  referred this matter to an attorney, correct?
6      A.  Correct.
7      Q.  And when exactly did that occur?
8      A.  Sometime in August or early September.
9      Q.  Do you remember asking Mr. and Mrs.
10  Snyder questions and telling them that you could have
11  an attorney do this and it would be one hundred times
12  worse?
13      A.  No, I do not remember that.
14      Q.  Did you make any inquires or did you
15  discuss with the Snyders your concerns about the
16  types of things taken?
17      A.  At the meeting?
18      Q.  Yes.
19      A.  I don't think so.
20      Q.  Okay.  Do you remember the Snyders, apart
21  from the money orders and some of the other things we

18 (Pages 66 to 69)