DEPOSITION OF MARY LOU SNYDER
CONDUCTED ON FRIDAY, JUNE 14, 2002

3 (Pages 9 to 12)

Page 9

1  the President of?
2  A. Yes, it is. He was not my husband at the
3  time, but yes it is.
4  Q. Okay. The same company?
5  A. Correct.
6  Q. Okay. He testified that that went out of
7  business in 1994?
8  A. That's correct.
9  Q. Have you ever worked since 1994?
10  A. No, I have not.
11  Q. How long did you work at West Com before
12  it closed?
13  A. From 1989 till it closed.
14  Q. And you haven't worked any other place
15  since 1994?
16  A. That is correct.
17  Q. Is there a reason why you haven't worked
18  since 1994?
19  A. I'm disabled.
20  Q. What is your disability?
21  A. My disability is I have extreme anxiety.
22  I had ADD, just pressure, I can't handle a lot of

Page 10

1  pressure a lot of times. And then my most recent
2  one is I have had two spinal fusion surgeries. I
3  had nerves burnt in my -- I continue to have
4  treatments on my back and my neck. I will always
5  have treatments on my back and my neck.
6    I have been declared permanently disabled
7  by my surgeon on my back.
8  Q. In 1994, once the business shut down, were
9  you disabled at that point?
10  A. Yes.
11  Q. Let me go to what was marked as William
12  Snyder Exhibit No. 1, it's a letter dated September
13  28, 2001, did you receive this letter?
14  A. I received it, but I didn't receive it on
15  September 28, 2001.
16  Q. Right. Shortly thereafter?
17  A. Mid October.
18  Q. Okay.
19  A. Mid to late October.
20  Q. Why did you receive it six weeks later?
21  A. I never got it. It was never mailed to
22  me.

Page 11

1  Q. Okay. At that point this document is
2  writing to you asking for certain documents, did you
3  ever provide those documents to Chester County
4  Mutual?
5  A. No, I did not.
6  Q. Why not?
7  A. Some of them are not available, do not
8  exist, and I felt the other ones had nothing to do
9  with the theft of my home.
10  Q. Okay. Did anyone ever tell you not to
11  produce them?
12  A. No, not until I contacted counsel, but
13  prior to that, I've had several conversations with
14  Mr. Reede and, excuse me, Mr. Reede, and
15  particularly Mr. Hoover, and it was my understanding
16  that there would be nothing that I could provide to
17  him that would have been okay. He asked for more
18  receipts. I got more receipts. You know, he said
19  that the claim was so voluminous and high, well I
20  was instructed to put $19,000 extra on to that claim
21  to begin with. So, immediately I was misdirected in
22  this claim. This thing, I felt, did not start off

Page 12

1  right from the very beginning.
2  Q. Okay. Let's see, could you read that
3  back?
4    (Previous answer read back.)
5  Q. Let's go back to this document, number one
6  asks for your individual income tax returns for 1999
7  through 2000, do you have those documents?
8  A. No, I don't.
9  Q. Why don't you have them?
10  A. Because I don't have --
11  MR. CHAKRABARTY: I'll object to that.
12  I'll object to this line of questioning as I have
13  objected earlier during Mr. Snyder's testimony. I
14  still believe that these are documents that are
15  irrelevant to the Plaintiff's claim in this matter,
16  but go ahead.
17  A. So, do I answer?
18  Q. Yes.
19  A. The income I receive is from a private
20  disability, which I paid for, therefore it is not
21  reportable income. So, I do not file income tax.
22  Q. Okay. The second item on here is your

**37**

1  not definite, when I got the certificate for
2  whatever gift they were giving away that day, that
3  weekend.
4     Q. Did you ever get the gift they were giving
5  away that weekend?
6     A. I believe -- I'm sure I did, because it
7  was -- but I don't remember what the gift was that
8  weekend. I mean I get --
9     Q. Do you have any gambling debts?
10    A. What do you mean, do I have any gambling
11 debts? Do I owe money?
12    Q. Yes.
13    A. Oh no. I never have. I didn't even know
14 what a marker was until Mr. Hoover started implying
15 that I might have linked my gambling with a
16 burglary. I had to find out what one was. I do not
17 play tables. I am not a high roller. So, I have
18 never had a marker, don't have a marker, don't ever
19 intend to have a marker.
20    Q. While you were gone on vacation was there
21 anyone that entered your house with your permission?
22    A. No.

**38**

1     Q. Do you know of anyone in the area who had
2  your key, in Earleville or the surrounding area?
3     A. No. I don't even think our neighbors have
4  it.
5     Q. Where were you when you found out about
6  the theft?
7     A. I was on the gambling floor. I was paged.
8     Q. Was somebody calling you there?
9     A. It said Mary Lou Snyder, please call the
10 hotel operator.
11    Q. When you called the hotel operator what
12 happened?
13    A. My husband was on the phone.
14    Q. Did he call you after he received the call
15 from your neighbor at his daughter's house?
16    A. I would assume, he wouldn't have known
17 otherwise.
18    Q. Okay.
19    A. To answer that question, yes, he did.
20    Q. Okay. All right. I'll show you what has
21 been marked William Snyder Exhibit Number 3. This
22 is a copy of the Criminal Investigation Report from

**39**

1  the Sheriff's Office.
2     Going to page five of five, where it lists
3  the total value of the stolen items it has about
4  $15,000, $15,206.88, do you know why this number
5  here is so different from the number of your claim?
6     A. Oh, the $15,206.88, oh absolutely,
7  Detective or Deputy Allen, I'm sorry, Deputy Allen
8  was standing -- I remember I was sitting in our
9  recliner, I was still in shock, and he wanted to
10 know if I had a list of items that were missing. I
11 said, no, I don't. He said, well what we need to
12 get is a quick list of items such a electronics or
13 things that might go into a pawn shops or into flea
14 markets.
15    I said, I really don't have any idea. He
16 asked me to look around for the obvious items that
17 were right in that area that I was sitting in, so
18 that is what I did.
19    Q. So, you and you husband compiled a list
20 and gave it to the police department?
21    A. Well, I mostly compiled it. I think he
22 put down one or two tools that we knew were right

**40**

1  there, but didn't compile the list, I told this guy
2  what was on there and he --
3     Q. While he was out at the house?
4     A. Yes. He knew that that was not even close
5  to being complete.
6     Q. And when did you verbally tell him these
7  items?
8     A. On the 12th.
9     Q. Okay. How did you know what the serial
10 number was on those items?
11    A. I have owner's manuals. I had just begun
12 to, because we had major renovation in our home
13 before, started to gather my owner's manuals into
14 one place. So, I had a set.
15    Q. When did you start doing that?
16    A. Beats me.
17    Q. Was it a year before the theft?
18    A. No, it was within, you know, if I was
19 watching TV I'd pull a bunch of them together, so
20 maybe it was between, I don't know. I have no idea.
21 I couldn't even venture a guess.
22    Q. Did you also tell him the values that are

DEPOSITION OF MARY LOU SNYDER
CONDUCTED ON FRIDAY, JUNE 14, 2002

15 (Pages 57 to 60)

Page 57

1   A.  I think the next communication I had with
2  Scott was after I talked to George Reede, and he was
3  setting up a meeting for himself, and he just said a
4  representative from Cumberland Insurance Company to
5  come to our home.
6   A.  At that point he also asked me, I said
7  what's the problem?  What's the tie-up.  He said,
8  you know, it's just a large claim, and do you have
9  any more receipts?  I said to him, any more
10 receipts, I don't know of people that have that many
11 receipts.
12      He said I know, but anything that you can
13 produce extra would be helpful.  That's when my
14 husband proceeded to go to the Woodworker's
15 Warehouse and have them go through their records,
16 and Shone's Lumber to write the letter.
17  Q.  Let's back up a little bit.  You said that
18 in the beginning of July, after you had received the
19 check for $1,500, you called Frank Hoover to thank
20 him for the check.  Was that the first time that you
21 had any contact with him?
22  A.  I believe -- oh no, no.

Page 58

1   Q.  When was the first time you had any
2  contact with him?
3   A.  Forgetting a very big part.  It was in the
4  middle of, I can't remember.  I don't know if it is
5  the middle of May or the middle of June.
6   Q.  In May or June?
7   A.  Right I believe it's May.  Let me back up
8  a little bit.  At the end of April, I got a
9  cancellation notice from my policy, for non-payment
10 from Cumberland.  And by the time I got it I only
11 had till the next day to get the payment to them.
12 So, I quickly called, and I said to the young lady
13 that I spoke with and I have all that information,
14 they have it.  At any rate she said to me, look
15 you've been with us for this many years, she said 12
16 years, you know, you have been great customers.  She
17 said no sense running there, you know, because that
18 was a Friday.  She said we're not going to get it
19 till Monday.  So, if you send it regular mail, that
20 will work out.  I'll just note the records.  She
21 said we'll get it a day or two after that that's
22 what she said, but because you have been long

Page 59

1  customers don't worry about it.  She said, and I'll
2  note the records.
3       So, I sent the check.  And I would say,
4  two weeks later I got a letter back from Chester
5  County Mutual, saying that my coverage was
6  terminated due to non-payment.  They returned my
7  check.  And they said, you know, they didn't process
8  it, it was too late, and I don't have coverage any
9  more.
10      So, I immediately called, I don't recall
11 people's name exactly, in the beginning that I spoke
12 with.  I explained the situation of my call to -- I
13 said I had the date, the time, the girl's name, I
14 believe her name was Margaret.  I had all the
15 information together, and it was the underwriter, I
16 believe, department, that they sent me to, and they
17 said, no, we're not going to do it.
18      So then, I said, well, who is higher up
19 than you?  At some point I got Frank Hoover.
20  Q.  So, that would have been towards the end
21 of May, or towards the end of June?
22  A.  It was in this very day the same

Page 60

1  conversation.
2   Q.  Same day?
3   A.  Yes.
4   Q.  Okay.
5   A.  And he said, no, nothing I can do for you.
6  And so, I said, who is higher up then you are?  And
7  he said, nobody is going to do it for you.
8       I said, I have the documentation, I have
9  been with you for this many years, you have thanked
10 me for 12 years of not having any loss.  Now, you're
11 going to cancel my policy after the girl told me
12 this, is that what you do?
13      And he transferred me.  Oh, he said, it's
14 just not going to happen.  You're not going to get
15 reinstated, your bill didn't get paid in time and
16 you're not going to get reinstated.  I said, well I
17 want the President's name, and after some back and
18 forth banter he gave me the President's name.  I
19 don't remember the man's name.
20      I said, the President was leery also about
21 reinstating us.  He said that, he would have to
22 check into the situation, and that he would be back

**61**

1  to me. I said well, understand that in the meantime
2  I'm calling the Insurance Commissioner, which I did,
3  and I reported it.
4     Q. In Maryland?
5     A. Umm, yes. Later that day, I received a
6  call back from a totally different person, a Vice
7  President, of -- I guess underwriting, who said to
8  me that, just send the check back, and they would
9  reinstate it once the check cleared they would
10 reinstate our policy, with no lapse in coverage.
11    Q. Was that the first time that you had
12 talked to Frank Hoover then?
13    A. (Nodding in the affirmative.)
14    Q. And then was the second time you talked to
15 him to thank him for the $1,500 check?
16    A. I believe so, yes.
17    Q. Okay. Then did you have any other
18 conversations with him before the meeting with Scott
19 Johnson and Frank Hoover?
20    A. Before they both came out together?
21    Q. Right.
22    A. Oh yes.

**62**

1     Q. When did you talk to him between the thank
2  you for the $1,500 and the meeting with Scott
3  Johnson and Frank Hoover?
4     A. After I called Scott Johnson, in the
5  beginning of August, asking him about the follow-up,
6  did he need anything? He sent it to Frank Hoover.
7  I called Frank Hoover. And I said, I talked to
8  Scott, he told me that he sent you the claim. I
9  wanted to see if you had any questions, or anything
10 I could do to help to move this along.
11       A that point he said, well, I have it on
12 my desk, I'm just looking through it. He said, but
13 it's rather voluminous, and I'm sure I'll have some
14 questions.
15       I said, well, about how long will it take
16 at this point? He said, about a week, maybe a week
17 and a couple days. So, I waited approximately two
18 weeks. I called him back. And --
19    Q. So, this would have been about the middle
20 of August?
21    A. Uh huh.
22    Q. Okay.

**63**

1     A. The middle to the end of August. And up
2  to that point, he was very cordial, we got along
3  fine, you know, there was no problem. As I said, I
4  thanked him for his cooperation and his
5  understanding.
6        When I got him on the phone that time, I
7  said, you know, what is the status of it? It was
8  like Jekyll and Hyde, he was like, he was nasty. He
9  was like kind of -- he was -- I felt, as a woman, I
10 felt he was trying to scare me, I really do. He was
11 that way. He said, look, I've had -- and I'm going
12 to guess the years because I'm not sure, either 15
13 or 22 years in a Claims Department in insurance, and
14 I have never had a claim, a home owners claim this
15 voluminous. And he said, so I have turned it over
16 to our attorney. I said, what? He said yes, I've
17 turned it over to my attorney.
18       So, I said well, what's going to go on
19 from then? He said, you'll find out, when you get
20 to the attorney. I said, well, who is the attorney?
21 He said, I'm not going to tell you that. You'll
22 find out who he is when you get the letter.

**64**

1        This is what I said to him, you know,
2  you're making me feel like a rape victim. I feel
3  like I was raped. I'm coming into the hospital to
4  report it and you're the doctor, and now you're
5  laughing at me.
6        I said, you have no right not to give me
7  the information. You have been leading me along
8  that everything was okay. You have no right not to
9  give me the information about who this attorney is.
10 So, he finally gave me the name of George Reede.
11    Q. That was all in one conversation, in the
12 middle to the end of August?
13    A. Uh huh.
14    Q. Is there anything else in that
15 conversation that you discussed?
16    A. At that point, I don't believe there was.
17 We had a couple conversations, so, I'm not sure
18 there might have been bits or piece in the next
19 couple, but I'm not sure exactly. But that was the
20 gist of that conversation, where I said, you can't
21 deny me knowing why you're refusing -- you're not
22 working on my claim and why you sent it to an

65

1 attorney.
2   I said, that means I have to get an
3 attorney. And he said, well, you'll find out when
4 you get a letter from my attorney.
5   He would not give me the terms of his
6 problem. Not the terms, he did not give me the
7 reason that he had a problem with my claim, other
8 than it was voluminous, and in his tenure as the --
9 in the adjustment, or excuse me, in Claims for
10 insurance, it was the highest that he's ever seen.
11   So, at that point, I called -- he gave me
12 Mr. Reede's phone number. So, I called Mr. Reede,
13 and I got his answering machine, and I left a very
14 vivid -- I was very irate and upset at that point.
15   And I said, I just got off the phone with
16 Frank Hoover, and he has told me that he has
17 referred this claim to you, he won't tell me why. I
18 said, you know, everything was all fine, has been
19 fine up to this point, now all of a sudden it's like
20 Jekyll and Hyde. I don't know what the heck's going
21 on. I said he's being very, very evasive, and I
22 don't know what's going on. I need you to call me.

66

1   Mr. Reede did call me back, very polite.
2 He said -- he said also about the -- it was
3 voluminous, and about that they had -- that Frank
4 had questions on the dollar figure of the claim
5 being so close to the coverage. I said, well first
6 of all, you people had me, and I said, "you people"
7 but I really meant it was Scott, directed, I guess
8 by Cumberland, I said, you people had me put an
9 extra $19,000 on it right off the top.
10   I said by telling me I had to put down
11 jewelry and coins, and cash, and money orders that I
12 knew were never going to be covered.
13   And then I -- I related to him about the
14 rape victim thing too. He said, look, let me get
15 back to you. Let me call Frank and Scott, and I'll
16 get back to you. He did. He got back to me. And
17 he said he was turning it back to Scott. And I
18 don't know if he said, Scott and Frank, but I know
19 Scott. That Scott would be getting in touch with
20 me. And that Scott and somebody from Cumberland
21 would be calling me to set up an appointment --
22 excuse me, let me back up.

67

1   He asked me had Mr. Hoover, of anyone from
2 Cumberland been to my home yet? I said, no. Then
3 he we proceeded -- he got in touch with Scott.
4   Scott called me and made an appointment,
5 and it was some time in September. He said that he
6 and somebody from Cumberland was going to be coming
7 out to our home.
8   Now, in the meantime, before that
9 appointment, before that appointment came, I had
10 called the detectives, excuse me Captain of
11 Detectives, and his name was Bob Irwin and I
12 explained the situation. I said, you know, it's
13 like I'm being accused of doing this. And I had --
14 I said, I wasn't even home. And I said, you know,
15 there's been all these other burglaries. There was
16 several burglaries before ours, and there were
17 several after ours. There was a rash of burglaries
18 in our area. My husband had been involved in -- we
19 had gone to the meetings with the Commissioners, in
20 support of getting a substation for the deputies to
21 be in our area, because it took anywhere from 45
22 minutes to an hour, depending where they were, to

68

1 get into our area.
2   So, he said, and I don't know his exact
3 words, but he said, something like, they do that to
4 everybody. Insurance companies automatically just
5 turn you down.
6   He said, they probably think that you're
7 jerking around with the numbers. And he said, but
8 let me tell you, if I thought that you were -- had
9 anything to do with this, I would be investigating
10 you myself, he wouldn't have to be bothered doing
11 it.
12   I said, would you please call him and tell
13 him that. So, he did call Frank Hoover and spoke
14 with him. And all Captain Irwin did was call me
15 back and relay the information that he had had a
16 conversation. Am I talking too much?
17   Q.   Were there any other communications
18 between you and either -- first of all, besides the
19 people that you said you talked to, I guess
20 regarding the cancellation of your policy, and you
21 weren't sure of some of their names, did you ever
22 talk with anyone else at Hagan & Associates, which

**Page 69**

1  is where Scott Johnson works, besides Scott?
2  A. Just the lady who answers the phone to ask
3  for him.
4  Q. Not in regards to your claim?
5  A. No.
6  Q. How about at Cumberland, was there anyone
7  else that you talked to there, or just Frank Hoover?
8  A. He was the one I dealt with. I mean, like
9  I said during the cancellation period I think I
10 talked to everybody, there's only about a few people
11 there.
12 Q. But in regards to your claim?
13 A. Not that I recall.
14 Q. Okay. So, after these series of telephone
15 contacts at the end of August that you have
16 described, was there any other communication with
17 you and Scott Johnson --
18 A. Yes, there was.
19 Q. Or Frank Hoover before the meeting?
20 A. Yes, there was.
21 Q. What was that?
22 A. When Scott left a message that he would be

**Page 70**

1  coming out, and he wanted to set up a date for he
2  and Frank Hoover to come out. I called back and I
3  said, I don't care who you bring out from Cumberland
4  Insurance, but you will not bring out Frank Hoover.
5  He is not welcome in my home. He has lied to me.
6  He has done things that have been accusing me, or
7  leading me to be believe that I was accused of a
8  burglary in my own home. I said, and I do not want
9  him. I don't think that he'll give a fair
10 evaluation. I do not want him out here.
11     So, Scott called me back and he said, I
12 think it's going to have to be to Mr. Hoover, Mary
13 Lou. I said, well, I don't want him. Then Frank
14 Hoover called me, yelling at me. I mean yelling at
15 me. Who do you think you are? You tell me -- you
16 have told people I'm a liar. You said that I've
17 accused you of this burglary, and I never accused
18 you of this burglary. I'm no liar. I said I didn't
19 say you were a liar, I said you have lied to me.
20     And we went on and on, then we finally
21 came to terms. I said, look, I just want to get
22 this over with. If it has to be you, it has to be

**Page 71**

1  you. This has been nothing but a pain all along.
2  If it has to be you, then so be it.
3      I said, let's try to start fresh when you
4  come out for this but -- I mean, he was very
5  personable at that point. That was the last
6  conversation till they came to our home.
7  Q. When you said that he had lied to you,
8  what were you referring to?
9  A. Oh, I'm sorry, when I spoke with
10 Mr. Reede, the first time after I spoke with
11 Mr. Hoover, and he wouldn't tell me who Mr. Reede
12 was. I asked Mr. Reede, when did you get this claim?
13 And the date that he gave me was the date that I had
14 called Scott -- excuse me, I called Mr. Hoover and
15 he told me that he was just having it on this desk.
16 He was sure that he would have some questions on it.
17 He was just looking it over. All the while he had
18 already turned it over to an attorney.
19     And let me recall, there was another time
20 too, where he had led me to believe that everything
21 was okay, and all the time it was delving into my
22 background. And it had something to do with the

**Page 72**

1  accusation that I had something to do with, because
2  I was away in Atlantic City, on a vacation, that I
3  had something to do with this burglary.
4      But I don't recall which conversation. I
5  believe it was something that was said to, Detective
6  Irwin, I mean Captain Irwin, and that is when Capt.
7  Irwin said, you know, if she was involved we would
8  have investigated her.
9      Also Captain Irwin told me that, if he
10 said what he told me -- now, if he said this to Mr.
11 Hoover or not, I don't know, why would Cumberland
12 insure you for $105,000 if you didn't have that kind
13 of possessions? He said, do they have the money to
14 pay this claim?
15     He said, and -- as far as he said -- he
16 said he thinks, I bet he just thinks that you're
17 jerking around with the numbers. I said, well, he
18 has never said that. You know, my -- up to this
19 point, I had no idea I was a problem.
20 Q. Okay. So, Frank Hoover never told you
21 directly that he thought you were responsible for
22 the burglary that's what Captain Irwin told you?

73

1   A. He implied it. I don't know what he said,
2   but he implied it. He said -- he would never come
3   out and say it. I mean, he's an intelligent man, he
4   would not come out and say that.
5       He said something like, it's unusual that
6   you would be -- and I don't know the exact words so,
7   you know, I couldn't swear to this. It was
8   something so the effect, it's unusual that you would
9   be in Atlantic City, then all of a sudden all of
10  these things happened, all of this stuff is taken
11  from your home.
12      Q. And that was one of the conversations that
13  you had with him in August?
14      A. Yes.
15      Q. Okay.
16      A. And like I said, we had -- it was very
17  personal at this time.
18      Q. Were there any other communications that
19  you had with Scott Johnson, or Frank Hoover, prior
20  to the meeting at your house? Besides the ones that
21  we have been through?
22      A. Yeah, I called Scott the day before, or he

74

1   called me, I don't remember. We had a conversation
2   the day before. And I said, is there anything else
3   that I could do. He confirmed that it was Frank
4   Hoover that was coming. I said, is there anything
5   else I can do to get this to go more smoothly? And
6   as I said, you know, get as many more receipts as
7   you could. That's what my husband did that, and
8   until they came to my home that was the last time I
9   spoke with him.
10      Q. What is your memory of the meeting that
11  happened at your house?
12      A. What I did is, because I was so -- I was
13  very suspicious, I thought that I was not going to
14  get paid for this claim whatsoever. Just from what
15  was happening from the cancellation of my policy, to
16  all these other, oh, yeah, I'm looking at it when it
17  is really at an attorney's. You won't tell me who
18  the attorney is. You're not going to tell me why it
19  is there.
20      So, I remember him -- he and Scott, as I
21  said I had met Scott before, but I had never met
22  Frank Hoover, walking across our lawn. And my

75

1   husband said to me, he's not going to pay this
2   claim. He said, I could just tell by his demeanor,
3   he's not going to pay this claim.
4       I said, no he -- once we get everything
5   worked out, because oh gosh, I'm sorry there's just
6   something else too I forget. There was something
7   else in my conversation with Scott Johnson. I'm
8   sorry.
9       Q. Which conversation?
10      A. The one right before he came, the day
11  before he came.
12      Q. Okay.
13      A. I told him that I was going to have --
14  when he told me that Mr. Hoover was coming, I said,
15  okay, I'm having a representative from the Deputies
16  Office, or Sheriff's Office be there as my witness.
17      And he went, you can't do that. I said,
18  yeah I am. I want -- I don't trust anything that is
19  going to go on here. I want the Sheriff's Office
20  to have a representative out here, because the
21  people behind us were related in this, in the theft.
22  I mean, they had suspects.

76

1       And so, he said, well, we're going to be
2   going over this line by line. I think that is a
3   waste of his time. I said, well, I really don't
4   care if you think it is a waste of his time or not,
5   this is my life, and I want this taken -- I want the
6   police to be there.
7       He said, this is going to take several
8   hours, and I think his time would be better spent --
9   that their time would be better spend trying to
10  locate the people who committed this burglary.
11      He said, I do not want the police there.
12  I said, all right. So, I was -- as I said, I was in
13  the internet looking up, what do you do, what do you
14  do? It said always have a witness when somebody
15  from an insurance company is going to come out to
16  your house.
17      So, we had called Bill's sister, who had
18  been in insurance, had been in the Claims
19  Department, although it was for auto insurance for
20  several years, and she was going to be our witness.
21      Q. What is her name?
22      A. Cathy Brookings. So, she came to our

**77**

1 home.
2    Q. She was there during the meeting?
3    A. Uh huh.
4    Q. Again, okay, you saw them walking across
5 the lawn?
6    A. Uh huh.
7    Q. What do you remember about your meeting
8 with them?
9    A. I know it was very awkward coming in. I
10 remember we sat down. I offered them danish and
11 coffee, they refused. And I said, you know, I hope
12 this gets off to a better start then where we have
13 been before, go forward from here.
14     And so, Mr. Hoover started to ask me
15 questions that I had already answered to Scott
16 Johnson. And my husband said, before we get started
17 into this, can I ask you like -- like what the
18 procedures is going to be, because you -- Scott
19 Johnson already asked my wife all of these
20 questions, so, I just want to know what the
21 procedure is, and where we're going to go from here?
22 And Frank Hoover was belligerent, at best, and said,

**78**

1 look, I could have my attorney do this, and it would
2 be 20 times worse.
3     And we're like, whoa, whoa, we're not
4 saying -- he just wants to have the procedure. What
5 are we going to do today? Are we going to go
6 line-by-line like Scott said? That's all we wanted
7 to know. And so we said, okay, hold on, this is
8 getting bad already. And we brought it back into
9 line again.
10     I remember -- I remember the meeting
11 being -- as I said, it was my understanding that
12 Scott -- from Scott, that they were going to go
13 line-by-line with each item, and if they had any
14 questions, we'd talk about them.
15     And that was not what was happening.
16 Mr. Hoover picked out several items. And it was
17 obvious to me that he didn't even look at any of the
18 receipts, because the things that he asked me about,
19 had cash receipts, he had the cash receipts.
20     He was very sarcastic when it came to
21 certain things. He was okay at other times. He
22 asked, for instance, oh, you have a bar blender? He

**79**

1 said, do you have a bar? My husband said, yeah, I
2 have a bar right out there. He said, oh yeah, you
3 paid full price. Where did you get it? I have --
4 and he was telling me he got it from E-Bay, you
5 know, and it was just a normal conversation about
6 that.
7     I said, you'll have to tell me when I
8 replace my things how to get that. Then he said,
9 you mean you have money orders in your house? And I
10 was right there to say, that's really not your
11 business, because you're not paying me for that.
12 Unless you're paying me for that, I don't have to
13 answer, but I didn't. I wanted to cooperate. I
14 cooperated up to this point. I said, as a matter of
15 fact, they have a warrant out for somebody's arrest.
16 Let me get that paperwork. It has been through
17 the -- I forget his title.
18    Q. Someone from the Sheriff's Department?
19    A. From the State, someone from the State.
20    Q. State Police?
21    A. No, government.
22     MR. CHAKRABARTY: State's Attorney's

**80**

1 Office?
2    A. Yes, State's Attorney's Office, thank you.
3 They had done all the subpoena work for the postal
4 people. And I said, let me go get that and show it
5 to you.
6     Well, I bring it out and, I don't need
7 it -- I don't want to see that. I'm thinking, you
8 just asked me about it, and it is none of your
9 business. You're making me feel foolish, like I
10 really shouldn't have money orders in my home. You
11 won't look at proof of somebody who was involved in
12 this burglary.
13     The next question he -- I don't know if it
14 was the next question, but another question I
15 remember him saying to me was, china, you have
16 china, you don't even have a dining room? And my
17 husband proceeded to tell him about the bank of
18 windows that we have, the 16 foot of windows with a
19 big stainless table, with a glass top, that seats
20 eight to twelve people, that looks out on the
21 Chesapeake Bay.
22     And, okay, it might not be a room that you

Page 85

what we would talk about, as far as, what that item is worth, or anything like that. In fact, they never said to me, I don't think you have this item, or where would this item come from. Or other than the china and the towel bars and that type of thing. There was never a question of any particular item, you know, that it was never anything specific. When he left, when he got up, I had talked about my receipt for the dry cleaners, and if we didn't pay them that they would probably get rid of the clothes.

So, he agreed to contact the dry cleaners, which he did, and he sent me a check. And I said, what about the computer? Because prior to that I had rented a computer. I said, to him I need to have a computer. And this was Scott who said rent it. I think that's who said, rent it. And it was getting really costly.

So, I was able to get an account with Gateway, and when Mr. Hoover was leaving I said, here, how about, would you take this, let me go get this computer thing, I had it right there on the

Page 86

counter. He said, no, wait until you get your prescription receipts. He said, send them together and he said, we'll get them paid. Then we'll get you a check for a partial payment so you can start to replace some of these items.

I said to him, okay, well now, who do I deal with? Do I deal with you, or do I deal with Scott? And he said, oh, you deal with Scott. He said, that's why Scott makes the big bucks, and they left. And I said, I think everything's fine. I really thought everything was fine, because we had calmed down towards that part.

But two days later, or three days --
Q. Let's back up real quick. Is there anything else during that meeting, that happened, or that was told to you regarding the claim?
A. Well, my main thing was that the inflated part came from them, not me. This thing wouldn't be in question if I wasn't told to put $20,000 extra onto this claim.
Q. Did you tell them that in the meeting?
A. Yes, I told them. I told George Reede

Page 87

that when I very first talked to him. I said, that's why it's voluminous, I was told to add this money on there.
Q. Is there anything else that was discussed at that meeting in September?
A. I'm sure there was, but I don't remember anything. I remember Bill's sister had asked a question and she was told she couldn't ask any questions. And so, she said, okay, I'll just ask my brother to ask them, you know, we were kind of put in our place a couple times.
Q. Was she there during the whole meeting?
A. Yes, she was. She said, she felt the same way that I did. That we had turned around everything was -- by the end of the meeting things had turned around. That she didn't see any problem with it going to be paid.

And like I said, she has been in claims, even though it was auto claims. She said, besides that, she said -- if I, when she was doing her claims, if when I was doing my claims, if I had any problems or questions about people, or I thought

Page 88

that there was fraud involved, I would tell them right then and there that I still have a problem. And I have to do some more investigating. I would not leave their house letting them think they're going to get paid.

And she said, Or, and/or I would send them a letter, when I got back to my office, stating that this is not okay. These are the problems that I see. And so, she said the way he left, you know, with the joking about Scott making big bucks, blah, blah, blah, we thought it was going to be okay.

We also talked about the gifts that I had won at the casino, like I had won a TV, and I had won -- I forget what those things were, a bike, I didn't win them, they give you -- they even give them to quarter players, it is not like you have to be a high roller to have you in the wintertime to keep coming down, they have like incentives. They are gifts that cost about like $100 to them, or less, they're worth $100.

But at any rate, we had put them all right on the top of the attic. They were all gone. And

### Page 97

1  I have counsel, he has counsel. You don't talk any
2  more, it goes counsel to counsel.
3      In this letter, he denied the claim,
4  because I wouldn't cooperate with him. He said, I
5  sent you a letter asking for -- you were sent a
6  letter asking for certain items and you chose
7  litigation instead of that. You know, your claim is
8  now denied according to blah, blah, blah, and then
9  he had something in the last paragraph, basically
10 like he could ask -- he reserves the rights under
11 something or another, and it led me to believe that
12 he could still ask more questions if he wanted.
13     And at the end it says, and if you have
14 any questions, call counsel. Like what is he doing?
15 You know, he knows of our conditions. He knew about
16 that. And he is sending me a letter to my home,
17 telling me he is denying the claim. That should
18 have gone to this firm, not to me.
19     I was like besides myself. I asked them
20 to please issue a restraining order against this
21 man. I want no further contact. I want him nowhere
22 near me, I don't want him to call me, or sending me

### Page 98

1  letters. That is why I have an attorney.
2      Q. Besides that, after that letter in
3  January, did you ever have any other contact with
4  him?
5      A. No.
6      Q. So, all the contact that you have
7  described here today, that's the contact and the
8  communication that you have had with Frank Hoover?
9      A. That I recall.
10     Q. Also with Scott Johnson?
11     A. That I recall.
12     Q. Okay.
13         (Short break taken.)
14     Q. I think I'm almost done here. Very
15 quickly, you can go ahead and mark this as Exhibit
16 No. 1.
17         (Whereupon Answers to Interrogatories were
18 marked as Deposition Exhibit No 1.)
19     Q. I just have one brief question regarding
20 this document here. I think you have actually
21 answered most of my questions that I had, that I was
22 going to ask you about this document.

### Page 99

1      If you could turn to page nine,
2  Interrogatory No. 12. Do you see that where it
3  says, identify litigation to which you are, or have
4  been a party during the last ten years.
5      Have you been involved in any lawsuits
6  within the last ten years?
7      A. Well, it is answered in Interrogatory No.
8  11.
9      Q. Are those --
10     A. Law suits, the only one that is a lawsuit,
11 that I know of, is the one, of course that we're
12 going through now, and the one that I have filed
13 suit against my husband, for my car accident
14 injuries. As far as the other ones for insurance
15 claims, they were not lawsuits.
16     Q. So, besides this action, and the one
17 against your husband, you haven't been involved in
18 any other ones?
19     A. No.
20     Q. Now, the one against your husband, is that
21 one currently in litigation, or has there been a
22 judgment?

### Page 100

1      A. No, it is current.
2      Q. Current. That's all of the question that
3  I have.
4         MR. CHAKRABARTY: I don't have any
5  questions.
6      You heard what I said before regarding
7  that you could read and correct the spellings or
8  something of that nature, but you can't actually
9  change your testimony?
10     A. I know.
11     Q. But, or you could agree to waive that.
12     A. I'll waive that.
13        (Deposition concluded at 4:26 p.m.)
14        --------------------