DEPOSITION OF: SCOTT JOHNSON
TAKEN ON JULY 22, 2002

Page 26

1  Snyders' home on the 18th, what did you observe?
2    A.  The house was still in disarray from the
3  burglary and Mrs. Snyder showed me areas where items
4  were stolen from.
5    Q.  Did you take some pictures on that date?
6    A.  Yes, I did.
7    Q.  Okay. You've done other theft claims
8  before, was this unusual, the state of the house I
9  guess?
10   A.  It was a house that I was told was
11 burglarized. It didn't look anymore unusual than any
12 other house that has been burglarized. They are all
13 different.
14   Q.  How about in terms of the amount of
15 disarray?
16   A.  Well, there were items in every room in
17 the house that looked like they had been moved.
18   Q.  And I guess I'm asking from your
19 experience, is that unusual or is that --
20   A.  They are all different. I've been in
21 some houses where nothing has been moved. The people

Page 27

1  didn't even know their house was burglarized.
2    Q.  Okay. I'd like to mark that activity log
3  as Deposition #3.
4        (Whereupon, Deposition Exhibit #3 was
5  marked for identification.)
6    Q.  I apologize because these are copies of
7  copies, but can you identify these?
8    A.  Now, what are you asking me?
9    Q.  Can you identify what that is?
10   A.  Photographs of the exterior of the house
11 and photographs of the interior of the house.
12   Q.  And those were taken on April 12th?
13   A.  Yes. And the other photographs I don't
14 know when they were taken because they were taken by
15 the insured.
16   Q.  Okay. But they were provided to you on
17 April 18th?
18   A.  Yes, they were. From that photograph
19 number one through the rest of them were provided by
20 Mrs. Snyder. Photographs one through 27 at the
21 beginning of the pile I took on April 18th.

Page 28

1    Q.  Let's mark the photographs that Mr.
2  Johnson took as #4.
3        (Whereupon, Deposition Exhibit #4 was
4  marked for identification.)
5    Q.  Okay. Was it clear to you in surveying
6  the house how the burglar made entry?
7    A.  Not exactly. I had to be told that they
8  came through a window. I think that's what
9  Mrs. Snyder thought, was that they came through a
10 window.
11   Q.  Okay. Were you shown that window?
12   A.  Yes.
13   Q.  And do you know if any of these --
14   A.  It should be the third or fourth
15 photograph.
16   Q.  Okay. I'll show you that same Deposition
17 Exhibit. So that was the window where they came in?
18   A.  I was told that's where they came in.
19   Q.  Okay. And I guess it's really hard to
20 see from this photograph, but was it evident, the
21 manner of how they actually did come in, what means

Page 29

1  they used to break in that window?
2    A.  From looking at the window, it wasn't
3  evident. That's why I told you, I was told that's
4  where they came in.
5    Q.  Okay. What did you observe on that
6  window?
7    A.  I don't think I really observed anything
8  on the window. It doesn't have to have a lot of
9  damage to it to pry it open. I think there was a
10 damaged screen or something also.
11   Q.  I think you have a note on number four
12 there.
13   A.  Fingerprint dust on windows, which was
14 probably from the police.
15   Q.  Maybe it's on the next page there, do you
16 have something regarding the screen?
17   A.  I have photograph number five. Someone
18 put these in the wrong order.
19   Q.  And what was your note regarding the
20 screen?
21   A.  Cut open to pull latches. That's what I

DEPOSITION OF: SCOTT JOHNSON
TAKEN ON JULY 22, 2002

Page 50

1  A. What do you mean by investigation?
2  Q. I guess in terms of verifying the claim
3  is it normal for you to do other investigations?
4  A. Well, yes, we spoke to the detective that
5  was handling the case.
6  Q. And do you know approximately when that
7  occurred, what month?
8  A. That was sometime in September of 2001.
9  I'm not sure of the exact date.
10 Q. But I guess that was after you received
11 the inventory, correct?
12 A. Yes.
13 Q. Previous to receiving the inventory, did
14 you conduct any other investigations?
15 A. Not that I'm aware of, no.
16 Q. Given your experience in the industry,
17 did you see any reason to conduct any other
18 investigations?
19 A. I don't think I received anything from
20 Mrs. Snyder aside from taking a statement from her
21 and getting the photographs. I requested the police

Page 51

1  report and then requested that she submit an
2  inventory with documentation to substantiate the
3  inventory and I think it took several months before I
4  received that.
5  Q. Okay. Well, going to that inventory, do
6  you know approximately how long it was from the time
7  that you asked her to prepare the inventory to when
8  you actually received it?
9  A. I asked her to prepare an inventory the
10 day that I met with her and I don't know exactly when
11 I received it. I had received it July 31st is when I
12 received it.
13 Q. Okay. Well, the conversation you had
14 with her regarding the waiving of the deductible,
15 do you know approximately when that occurred?
16     MS. DAVIS: I'm going to object. He
17 testified that he didn't talk to her about waiving
18 it.
19 Q. Okay. The absorption of the deductible.
20 Do you know when that occurred? Was that in response
21 to questions by Mrs. Snyder?

Page 52

1  A. It was probably the day that -- I already
2  went through this. Whenever someone is going to hit
3  a limit, I make them aware of that, that the
4  deductible will probably be absorbed in the amount
5  over that limit, when I'm making them aware of limits
6  under the policy, special limits.
7  Q. What is a special limit?
8  A. There are special limits in the policy
9  that limit special items.
10 Q. Okay. I'm sorry. I thought -- how
11 about -- what is the industry term for I guess the
12 complete amount of the policy, is that also a limit?
13 A. That's your policy limit.
14 Q. That's just a policy limit.
15     Okay. Did you have a discussion with her
16 regarding the policy limits in this case?
17 A. Not that I recall.
18 Q. Do you remember what the policy limits
19 were in this case?
20 A. I need to look at the accord sheet here.
21 184,700 on the building; 18,470 for other structures;

Page 53

1  105,279 for personal property items; 36,940 for loss
2  of use. And there are some other liability limits
3  and things like that that have nothing to do with
4  property claims.
5  Q. Okay. Do you remember a conversation
6  with Mrs. Snyder regarding inventory where she asked
7  what documentation she needed to provide you with?
8  A. Not specifically. I told her to provide
9  documentation to substantiate the inventory. I tell
10 every insurer the same thing.
11 Q. Do you know -- well, do you know when you
12 actually received the inventory?
13 A. I told you, July 31, 2001.
14 Q. Okay. How many conversations did you
15 have regarding the inventory in that period between
16 the actual coming to the home and the submittal of
17 the inventory?
18 A. I'm not exactly sure. We asked
19 Mrs. Snyder for this on the telephone, I probably
20 left her answering machine messages, and I'm pretty
21 sure I sent her a letter also requesting the