**Page 9**

1  A. Probably, well it was the whole time, but
2  I think it was, I started my business in 1983, I
3  believe, and closed it in 1994.
4  Q. Why did you close it in 1994?
5  A. I had medical problems.
6  Q. What sort of medical problems?
7  A. I have -- I had a five-way bypass coronary
8  artery disease, degenerative joint disease, torn
9  meniscus in my leg, I have chronic back pain. I
10 have two herniated disks. I have a bipolar disease.
11 I'm a manic depressive.
12 Q. So, since 1994, have you worked since that
13 point? Did you close your business then?
14 A. No, ma'am.
15 Q. And before you opened the business in
16 1983, just briefly, where did you work before that?
17 A. AT&T in Delta, Pennsylvania.
18 Q. I want to show you some documents here
19 today.
20    (Whereupon a Letter of 9-28-01 was marked
21 as Deposition Exhibit No. 1.)
22 Q. I'm showing you a document that's a letter

**Page 10**

1  dated, September 28, 2001, do you recall receiving
2  this letter?
3  A. It's a letter that I believe was received
4  and opened by my wife. She opens most of the mail.
5  I'm under doctor's orders not to handle mail like
6  this, or anything that came from the attorneys or
7  from Mr. Hoover, or anything at all that came from
8  Cumberland Insurance Company, to either let my
9  lawyers handle it, or have my wife read it.
10 Q. You said you're under doctor's orders for
11 that?
12 A. Yes.
13 Q. Do you have a copy of that? Is that
14 written doctor's orders?
15 A. No.
16 Q. Oral instructions?
17 A. That's correct.
18 Q. Which doctor gave you those instructions?
19 A. Dr. Marion Droba.
20 Q. And in what capacity does she treat you?
21 A. She is my psychiatrist.
22 Q. She has given you instructions not to open

**Page 11**

1  any mail?
2  A. That has to do with this case, yes.
3  Q. Okay. When did she give you those
4  instructions?
5  A. Pretty much from the very beginning, when
6  I started receiving -- particularly letters from the
7  attorney, from your firm. It just upset me so much
8  that she told me either to give it right to my
9  attorneys, basically that's what she told me, give
10 it right to my attorneys, that's why I was paying an
11 attorney.
12 Q. Do you know about approximately what time
13 period it was that she gave you these instructions?
14 A. No, I really don't remember. I know it
15 was in the beginning of when we started receiving
16 material from Mr. Reede.
17 Q. Do you know if it was before or after the
18 date on this letter?
19 A. I did not see this letter, so, I believe
20 it was before this letter.
21 Q. Okay. I wanted to ask you about a few of
22 the items that are listed on this letter.

**Page 12**

1  A. Okay.
2  Q. The first item that is listed, as you can
3  probably read in that second paragraph, the letter
4  is asking that you provide copies of the following
5  documents. The first document -- set of documents
6  that is requested was your U.S. individual tax
7  returns for 1999 through 2000, with attached
8  schedules. Do you have those documents?
9  A. No, ma'am.
10    MR. CHAKRABARTY: I'll object to this line
11 of questioning, but you can answer that question.
12 A. No, ma'am, I do not.
13 Q. You don't have 1999 or 2000 tax returns?
14 A. No, ma'am.
15 Q. Why not? Why don't you have them?
16 A. I don't file income tax.
17 Q. Ever?
18 A. Since, I believe the last one was, maybe
19 1995.
20 Q. Why don't you file any income tax?
21 A. I have no taxable income. I have
22 disability insurance that I paid for myself, which

**13**

1  is non-taxable, and I have Social Security
2  Disability income, which is also non-taxable.
3     Q. The second item on there asks for your
4  bank account statements, from January 1, 1999,
5  through and including, April 30, 2001. Do you have
6  those documents?
7     A. No, ma'am, I do not.
8     Q. Do you have any bank accounts?
9     A. Yes, I do.
10    Q. What bank accounts do you have?
11    MR. CHAKRABARTY: Objection to this line
12 of questioning. I would state an objection based
13 upon the fact that these are matters in dispute,
14 there is a standing Motion to Compel Discovery, and
15 we are in the process of responding to the Motion to
16 Compel Discovery regarding these items.
17    I'll let you ask whether they obtained
18 these documents, but with regard to actual contents
19 of these documents, I make an objection and ask my
20 client not to speak to those questions.
21    MS. DAVIS: In order not to get into a
22 debate about this I would like to respond to that,

**14**

1  but I would like your clients to leave the room to
2  put that on the record.
3     MR. CHAKRABARTY: Okay.
4     (Whereupon both plaintiffs left the room.)
5     MS. DAVIS: As you know there are limited
6  grounds for instructing -- are you instructing your
7  clients not to answer? I guess that is my question,
8  I wasn't sure.
9     MR. CHAKRABARTY: Well, I mean, I'm
10 instructing him not to answer as to the contents of
11 those documents. We can ask him if they have
12 retained those documents, but you know, if you're
13 going to ask beyond that, I don't know if you can
14 ask them exactly what checks, they don't have that
15 knowledge off of the top of their heads anyway, but
16 I would be objecting to, you know, essentially this
17 is the matter of your Motion to Compel Discovery,
18 specifically with regard to those items, so.
19    MS. DAVIS: I'm asking them about the
20 existence of the items, and what those things would
21 contain, but as I read the Federal Rules, that
22 information is not privileged.

**15**

1  So, I'm not sure what the basis is for
2  your objection?
3     MR. CHAKRABARTY: Well, I mean the
4  matter -- well, if that's merely the extent of the
5  questions, then I'm not going to instruct him not to
6  answer those questions. But, if you're -- I'm
7  assuming that you don't have copies of those
8  documents, with regard to specific items within
9  those documents, that is essentially the basis of
10 our entire law suit, and as I spoke to you and was
11 written in your correspondence to me, you know, as I
12 said, we want The Court to make that recommendation
13 as to whether or not those are relevant to matters
14 in this matter, in this lawsuit.
15    MS. DAVIS: Okay. But there is no
16 privilege or relevancy. So, I mean, I am going to
17 ask them about these documents. I'm going to ask --
18 my last question to him was, what bank accounts do
19 you have?
20    MR. CHAKRABARTY: Okay.
21    MS. DAVIS: And I don't think that is
22 privileged. So, I just wanted to clear up, if you

**16**

1  are going to instruct him not to answer then --
2     MR. CHAKRABARTY: Okay. No, I won't
3  instruct him. The questions regarding the existence
4  of bank accounts. Okay.
5     (Plaintiffs returned to the conference
6  room.)
7     Q. Mr. Snyder, when you left I believe my
8  last question to you was regarding the second items
9  on this letter regarding your bank accounts. Do you
10 have any bank accounts?
11    A. Yes.
12    Q. What bank accounts do you have?
13    A. It's Wilmington Trust.
14    Q. Is that savings?
15    A. That is a checking account. And I believe
16 we still have First Union checking account.
17    MR. CHAKRABARTY: I just want to note my
18 continuing objection. I think I said it before, but
19 I just wanted to note it since we took a break.
20 Okay, go ahead.
21    MS. DAVIS: If you want, I mean, I'd be
22 willing to, you can object to all of the questions

---

Page 49

1  A. No. One lives in Wilmington, Delaware,
2  and one lives in Pennsylvania.
3  Q. Do you know if they were at the house
4  while you were going?
5  A. I know they were not.
6  Q. Okay. Do you know was anyone in the house
7  with your permission, while you were going on
8  vacation?
9  A. No, ma'am.
10  Q. No one else in Earleville, or close to
11  Earleville, had keys to your house?
12  A. No, ma'am.
13  Q. Is that correct?
14  A. No, ma'am.
15  Q. Where were you when you found out about
16  the theft?
17  A. I was in -- at my daughter's house in
18  Pennsylvania.
19  Q. What part of Pennsylvania?
20  A. Glenolden.
21  Q. Outside Philadelphia?
22  A. Yeah outside Philadelphia, it's in

Page 50

1  Delaware County.
2  Q. Did you receive a phone call? How did you
3  find out?
4  A. Yes, I received a phone call.
5  Q. Who called you?
6  A. A neighbor.
7  Q. How did he know to call you there?
8  A. Well, she had -- she has my daughter's
9  telephone number. She was calling my daughter to
10  see if she knew where I was.
11  Q. What did she tell you, your neighbor tell
12  you, at that point?
13  A. She told me that our house had been
14  burglarized.
15  Q. How did she find out that information?
16  A. I think she saw the police cars, and she
17  only lives maybe four houses up, so you know, she
18  could see the lights, you know, the lights flashing
19  in the street. I think that's how she found out.
20  Q. When did you go to your daughter's house?
21  A. The afternoon of -- that would be the last
22  day there, the tenth.

Page 51

1  Q. The tenth?
2  A. Yes, ma'am.
3  Q. Were you only there on the tenth, at your
4  daughter's house?
5  A. Yes.
6  Q. Did you go home after that, after you
7  received this phone call?
8  A. Yes.
9   (Whereupon the Police Report was marked as
10  Deposition Exhibit No. 3.)
11  Q. What has been marked as No. 3 is a Police
12  Report, have you seen this before, or a Criminal
13  Investigation Report, that's what it is titled at
14  the top.
15   (Witness viewing document.)
16  A. Yes, I have.
17  Q. Okay.
18  A. Let me correct myself, I've seen the first
19  page. I know I've seen the second page. I don't
20  believe I saw the third page, and I definitely did
21  not see the fourth page, or the fifth page.
22  Q. Okay. Going to the fifth page, however,

Page 52

1  that is page 5 of 5, at the bottom, do you see where
2  it says, "total value"?
3  A. Yes, ma'am.
4  Q. $15,206.88?
5  A. Yes, ma'am.
6  Q. Do you know what that represents?
7  A. I would imagine it represents the sum of
8  what is on page four and the bottom of page three,
9  page four and page five.
10  Q. Okay. Are those items that were stolen
11  from your home?
12  A. Yes, ma'am.
13  Q. Now, this value here, the approximately
14  $15,000, is that the same as the claim that you
15  made?
16  A. No, ma'am.
17  Q. Why is it different?
18  A. Because initially -- an my wife dealt with
19  this more so with the Deputy from the Sheriff's
20  Department, he asked for items, quick items that had
21  serial numbers on them. And so he could try to
22  track them down. He said it was important that he

**Page 53**

1  get his items down with serial numbers on it, so it
2  would be in the first few hours, the first day or
3  so, to be able to track the items down and be able
4  to catch someone.
5      Q.  So these are all of the items that had
6  serial numbers on them?
7      A.  I don't believe they all had serial
8  numbers on them, no.
9      Q.  Did you help to compile this list for the
10 police?  For the Sheriff?
11     A.  I see a couple tools on here that I did,
12 yes.  So, yes I did, to some degree, yes.
13     Q.  Did those tools have serial numbers on
14 them?
15     A.  No, they had tool numbers on them, but I
16 don't believe that they had serial numbers on them.
17     Q.  Okay.  So, you said you returned home
18 after you got this call, that your house had been
19 burglarized.  When you got home, did you look around
20 for things that were missing?
21     A.  Not really at the time.  I mean the house
22 was ransacked, every room was turned upside down.

**Page 54**

1  It was just, you know, the first thought is just the
2  whole emotional part of it.  It's just when we knew
3  a lot of stuff was missing.  That's not my -- that
4  wasn't my first thought.
5      My first thought is my house has just been
6  turned upside down, and essentially violated.
7      Q.  When did you give this list to the police?
8      A.  I didn't.
9      Q.  Okay.  Did your wife give it to the
10 police?
11     A.  Yes.
12     Q.  Do you know when she gave it to them?
13     A.  I think the following day.
14     Q.  Meaning the 11th?
15     A.  Yes.
16     Q.  Again, I guess your understanding of why
17 this amount on here is $15,000, when that is
18 considerably less than your claim?
19     A.  My understanding?
20     Q.  Of why that is.
21         MR. CHAKRABARTY:  I object.  I believe he
22 has already answered that question, but you can go

**Page 55**

1  ahead.
2      A.  That represents the items that are on
3  here, the initial items that we gave them, they were
4  looking for quick items.  They were looking for a
5  very quick list, and this is what we brought to
6  them.
7      Q.  Okay.  At what time did you provide a
8  complete list to the police?
9      A.  That took months.
10     Q.  Do you know if it took three months or --
11     A.  Yeah, I think it took at least three
12 months.
13     Q.  Did you ever help them to compile a
14 supplemental report, or submit information for a
15 supplemental report?
16     A.  Help who?
17     Q.  The Sheriff's Department.
18     A.  You mean did I -- I didn't help the
19 Sheriff's Department compile a list.  The Sheriff's
20 Department didn't compile a list.
21     Q.  Well, these items here you said came from
22 a list that you think your wife gave to the

**Page 56**

1  Sheriff's Department?
2      A.  That's correct.
3      Q.  At some point later on, did you or your
4  wife provide a complete list to the police, or to
5  the Sheriff's Department?
6      A.  Yes, ma'am.
7      Q.  When was that?
8      A.  I'm not sure, that was months afterwards.
9      Q.  Okay.  From that list, did they provide --
10 the complete list that they were provided, was there
11 a supplemental report?
12     A.  Yes, a police report, a supplemental
13 police report?
14     Q.  Yes.
15     A.  Yes.
16     Q.  Do you know what the total value of all
17 the items stolen on that supplemental report was?
18     A.  Approximately, $89,000.
19     Q.  Do you have a copy of that supplemental
20 police report?
21     A.  Oh yes, we have a -- yeah we have the
22 itemized list.

Page 65

1  Q. Okay. So, when they came out, Frank
2  Hoover asked you some questions about items on the
3  list. Was there anything else that was discussed at
4  that meeting?
5  A. That's a pretty broad question. There was
6  a lot of things that were discussed.
7  Q. What was discussed besides the questions
8  about items on the list?
9  A. Umm, I know initially when Mr. Hoover
10 first started asking a question about what was on
11 the list, I asked him why he's asking the questions,
12 when Mr. Johnson had already asked some questions.
13 And his response was, in a very belligerent fashion,
14 that I could have my attorney do this, and I
15 guarantee you it will be 20 times worse.
16     So, that was something that I thought was
17 my right to ask, what is the process here and why
18 are we going through this procedure. I thought it
19 was very threatening and very hostile.
20 Q. I guess, initially at the meeting when
21 they came in, was Scott Johnson asking questions
22 first, or was Frank Hoover asking questions first?

Page 66

1  A. Frank Hoover.
2  Q. Okay. He was asking about questions on
3  the list, then you said he -- I thought you said
4  that at some point though that Scott Johnson had
5  asked some previous questions?
6  A. No. I said, I asked Mr. Hoover why he was
7  asking questions? What the process was? What was
8  going to happen? Why he was there?
9     And what I said was, that because in Scott
10 Johnson's initial visit with my wife, he had asked
11 questions.
12 Q. On the one that had happened about eight
13 days after the burglary?
14 A. That's correct.
15 Q. Okay. Was there anything else that was
16 discussed at that conversation, that you remember
17 from that conversation, when Scott Johnson and Frank
18 Hoover came out, approximately six months after the
19 loss?
20 A. Other than what was on the list?
21 Q. What was on the list, and that you asked
22 questions about the process?

Page 67

1  A. Right.
2  Q. Anything else that was discussed at that
3  meeting?
4  A. Mr. Hoover asked if we had any more
5  receipts, or could get any more receipts.
6  Q. What did you tell him?
7  A. We told him that we thought we had given
8  him everything we could possibly get. That very
9  morning, the meeting was at 9 o'clock, and that very
10 morning, like at 7:15 or 7:30, that is when I went
11 to Shone's to get the letter. Because I believe in
12 one of Scott Johnson's -- in one of Scott Johnson's
13 conversations with my wife before they came out, was
14 that, you know, can she get any additional receipts,
15 or you know, try to get any additional receipts.
16     So, that morning I went and got that
17 letter, and either the previous day, or the day
18 before that I also went to Wood Worker's Warehouse,
19 where I had purchased another tool, maybe four
20 months before that, and spent 45 minutes with the
21 gentleman there, who very nicely went through all of
22 his receipts to provide a receipt for me.

Page 68

1  Q. Was there anything else that was discussed
2  at that meeting?
3  A. Yes.
4  Q. What else?
5  A. I discussed the bankruptcy.
6  Q. What did you tell them?
7  A. I offered up information about the
8  bankruptcy. He asked about why we couldn't -- could
9  we get additional credit card receipts? And I said
10 that we didn't have credit cards any more. And that
11 the reason for that was, that at one particular time
12 I had considered bankruptcy, but that it got all
13 messed up, and that I decided not too, and one of
14 the reasons that I decided not too was because my
15 wife had a conversation with her attorney who was
16 handling her accident claim, and he also does
17 bankruptcy, and he asked are any of the creditors
18 basically hounding you? And she said, no, a lot of
19 them had written the debt off.
20     And his advice was, not to file
21 bankruptcy, and to handle each individual case as it
22 came up. And that's the advice that I took.

**69**

1   Q. Okay.
2   A. And I tried to show Mr. Hoover letters
3   that my wife had written to the bankruptcy attorney
4   that messed everything up, and to -- we actually --
5   she actually filed a complaint with the Attorney
6   Grievance Commission complaining that they did not
7   file the bankruptcy when they were supposed to.
8       We offered to show those to Mr. Hoover to
9   show that we had not filed bankruptcy. That we had
10  no intentions of filing for bankruptcy. And he
11  declined to look at them. He said he didn't want to
12  see them.
13  Q. I guess, going back to this bankruptcy
14  then, that is the one that we were discussing
15  previously, when you said you were in '99 and 2000,
16  you were thinking about filing bankruptcy? Is that
17  the one that you were talking about?
18  A. That's correct, yes, ma'am.
19  Q. You said the attorneys didn't file the
20  documents when they were supposed to. Were those
21  documents drawn up at that point?
22  A. I'm not sure.

**70**

1   Q. Okay. Did you ever see them?
2   A. No, ma'am.
3   Q. Was there anything else that you discussed
4   with Scott Johnson and Frank Hoover at that meeting?
5   A. Yeah, we discussed money, something about
6   money orders. We had money orders that we were
7   saving for blinds, instead of having cash and
8   spending cash, we purchased money orders. You know,
9   you're more reluctant to not cash a money order than
10  you are if you have cash there. We were saving for
11  blinds for the front of the house.
12      And we had told Mr. Hoover that one of
13  them that was cashed for $700, was cashed by someone
14  in Baltimore, and that the police were aware of it,
15  and they had a warrant out for his arrest.
16      We also offered to show Mr. Hoover that
17  document, the cancelled money order that showed on
18  the back the person's name, and he declined to look
19  at that also. He didn't want to see that either.
20  Q. Anything else that you discussed at that
21  meeting?
22  A. Nothing, other than the things that were

**71**

1   on the list. I don't believe so. I mean, there
2   could have been. I mean, you know, we asked him if
3   he'd like coffee and danish in the morning, but you
4   know, he said, no, thank you. There was not much
5   small talk.
6   Q. Okay. Did he tell you anything else
7   besides the things that you have already, the items
8   that we have already discussed?
9   A. Did he go over additional items?
10  Q. No, did he talk about anything else, other
11  than items on the list, or the need for more
12  receipts, or I guess, he was mostly -- did he talk
13  about anything else other than those things?
14  A. Yes.
15  Q. What else did he tell you?
16  A. I remember that at some point I asked
17  Mr. Hoover what the process was and how long this
18  was going to take to be paid. And he said, he
19  obviously wasn't prepared to do the calculations
20  that particular day. And he asked Scott Johnson how
21  long it would take. And I think they both came to
22  the same conclusion at the same time, that it would

**72**

1   take about two weeks to do the depreciation values,
2   and whatever else they had to do to the list.
3       And I guess that was midway through the
4   meeting. On the way out, after he had asked Scott,
5   at least three different times, he said, I have
6   nothing else, do you have anything? Mr. Johnson
7   said, no, he had nothing. On at least three
8   different occasions he asked him, and Scott Johnson
9   said, no.
10      I remember on the way out, when they stood
11  up they were going out the door, and my wife asked
12  about prescriptions, to pay for some prescriptions,
13  to ask for more money, you know. In the interim,
14  before they calculated what they had to calculate,
15  and he said, get the list together, give it to Scott
16  Johnson.
17      She also said at that time, that we had
18  purchased a computer and she had the receipt for
19  that, would he like it. She went to go get it. He
20  said -- she said, do you want me to go get it? He
21  they, no. Just give it to Scott Johnson, and I'll
22  pay it, when I pay for the drugs, the prescription